Henry L. Watkins v. Commissioner. Walter A. Biesterfeldt v. Commissioner.
Watkins v. Commissioner
Docket Nos. 21387, 21388.
United States Tax Court
1950 Tax Ct. Memo LEXIS 176; 9 T.C.M. (CCH) 448; T.C.M. (RIA) 50135; June 12, 1950
*176 Wayne B. Wright, Esq., and Thomas F. McDonald, Esq., 780-812 Olive St., St. Louis 1, Mo., for the petitioners. Frank M. Cavanaugh, Esq., for the respondent. JOHNSON
Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings the Commissioner determined deficiencies in income tax for the year 1943 as follows: Docket
No.
Petitioner
Deficiency
21387
Henry L. Watkins
$2,826.81
21388
Walter A. Biesterfeldt
1,545.23
The sole issue for decision is whether the Commissioner erred in his determination that the Ad Service Engraving Company, a corporation, upon its dissolution on October 31, 1943, in addition to its physical assets, had a good will value of $26,263, thus increasing the reported gain of petitioners, who were its only stockholders. Petitioners contend that the corporation had no good will, and if so, its value was greatly less than that determined by the Commissioner. Upon the hearing, other adjustments made by the Commissioner in his letters of deficiency were acquiesced in by petitioners. Findings of Fact Petitioners, Henry B. Watkins and Walter A. Biesterfeldt, are individuals residing in towns *177 suburban to St. Louis, Missouri, and each filed a separate income tax return for the year ended December 31, 1943, with the collector of internal revenue for the first district of Missouri. The Ad Service Engraving Company, hereinafter called the company, was incorporated under the laws of Missouri on June 15, 1922, with an authorized capital of $10,000, consisting of 100 shares of common stock of the par value of $100 each. Petitioners and three other individuals, viz: Crowe, Deal and Schieli, were the original incorporators, and each subscribed and paid $2,000 for 20 shares of its capital stock. All five incorporators were skilled mechanics in the work of the company, being journeymen or shopmen, and all gave their full time thereto in different capacities so long as they were stockholders. The business of the company was making engraving plates upon orders for the individual needs of its customers. The photo engraving process consists basically of obtaining a photographic negative of a picture or drawing and printing that negative on to a sensitized copper, zinc, or brass plate and etching it. The surplus metal is then removed and the plate is mounted and proofed. An engraving *178 plate is made in much the same way that a photographic print is made except the photograph is printed through the negative on to metal. The process consists of several basic steps and these steps are handled by separate departments within the photo engraving shop, requiring experts in each. The company continued in business in St. Louis until October 31, 1943, when it was dissolved by petitioners who then owned all of its stock, [1] Watkins owning 60 shares and Biesterfeldt 40 shares, and petitioners thereafter continued the business as a partnership. Prior to its dissolution, whenever stock of the company was sold, either Watkins or Biesterfeldt bought it, as they wanted to keep outsiders from buying into the company. Petitioners, by their service, experience, skill and ability contributed much to such success as the company *179 achieved. Watkins, while a boy, attended night school while serving his apprenticeship. He later became a journeyman in copper etchings and was proficient therein, and he was also a good salesman and in later years devoted much of his time thereto. The company had two other salesmen. Biesterfeldt was president of the company during most of the company's existence. His duties were exclusively in the shop where he served as finisher and proofer and also as foreman and superintendent of the shop. The company's shop labor was performed by skilled employees, members of the St. Louis Photo Engraving Union, to which petitioners also belonged. Most shop workers remain for some time, while some are often changing. Some of the company's employees they had had for a number of years, one for twelve years. If one quits, he can be replaced through the union agency. There were about 15 photo engraving shops in St. Louis, the shop workers in the company's shop, which was average in size, being from ten to twelve. This did not include salesmen and other employees. The majority of the company's customers were secured by personal calls of the company's salesmen, and each salesman had his particular *180 line of customers who would contact him when they wanted work done, and the customers did not often go to the shop, but placed their orders through the salesmen, but some orders did originate by telephone. Salesmen of a photo engraving business were generally paid 15 per cent of sales made by them, and this the company did at all times. The company had 50 to 75 accounts at the time of its dissolution, and all of its customers were in St. Louis. Its place of business was always the same, being premises rented on a monthly basis for no definite period and consisted of 5,500 square feet on the second floor of a six-story building which was reached by a freight elevator entrance. There was a name plate of the company at the entrance. Many landlords refused to take photo engravers as tenants, due to the nature of the business. To move a business of this kind would be expensive due to the heavy installations, plumbing wiring, etc. The company did very little advertising and depended largely upon the quality of its work and its salesmen to secure customers. Its books were kept and income tax returns made annually on a fiscal year basis from July 1 to June 30. The company's earnings, *181 dividends paid, etc., for each year of its existence were as follows: Earnings
Capital stock
Year ended
(after taxes)
Dividends
Balance at
outstanding
Net worth at
June 30
(loss)
paid
end of year
at end of year
end of year
1923
$ 1,059.35
$1,059.35
$10,000.00
$11,059.35
1924
15,209.99
$10,000.00
6,269.34
10,000.00
16,269.34
1925
14,757.07
16,500.00
4,526.41
10,000.00
14,526.41
1926
10,915.07
7,000.00
8,441.48
10,000.00
18,441.48
1927
5,536.64
8,000.00
5,978.12
10,000.00
15,978.12
1928
(5,477.34)
500.78
10,000.00
10,500.78
1929
5,494.48
5,995.26
10,000.00
15,995.26
1930
4,119.05
7,500.00
2,614.31
10,000.00
12,614.31
1931
(6,059.41)
(3,445.10)
10,000.00
6,554.90
1932
$ 775.63
[2,669.47)
$10,000.00
$ 7,330.53
1933
(3,896.02)
(6,565.49)
10,000.00
3,434.51
1934
1,055.35
(5,510.14)
10,000.00
4,489.86
1935
4,473.31
(1,036.83)
10,000.00
8,963.17
1936
4,141.92
3,105.09
10,000.00
13,105.09
1937
2,918.59
$ 5,000.00
1,023.68
10,000.00
11,023.68
1938
( 716.01)
307.67
10,000.00
10,307.67
1939
3,954.30
5,000.00
( 738.03)
10,000.00
9,261.97
1940
4,875.18
4,000.00
137.15
10,000.00
10,137.15
1941
1,960.84
5,000.00
(2,902.01)
10,000.00
7,097.99
1942
4,860.89
5,000.00
(3,041.12)
10,000.00
6,958.88
1943
7,117.30
7,000.00
(2,923.82)
10,000.00
7,076.18
Oct. 31, 1943
2,200.50
( 723.32)
10,000.00
9,276.68
*182 The company paid salaries to its officers for the period designated below as follows: Period ending
W. A. Blester-
Fred H. Schiele,
H. L. Watkins,
June 30
Total
feldt, president
vice-president
secy. & treas.
1939
$10,800.00
$3,600.00
$3,600.00
$3,600.00
1940
12,600.00
4,200.00
4,200.00
4,200.00
1941
10,800.00
3,600.00
3,600.00
3,600.00
1942
10,800.00
3,600.00
3,600.00
3,600.00
1943
8,700.00
3,600.00
1,500.00
3,600.00
Oct. 31, 1943
(4 mo. period)
2,300.00
1,200.00
(See note below)
1,100.00
Note: - When Schiele sold his stock, he was no longer with the company. His services had been unsatisfactory for some time and Biesterfeldt had been trying to buy his interest long prior thereto. A reasonable annual salary for each of the petitioners during the period above mentioned was $5,000 exclusive of dividends and selling expenses paid them. Since dissolution the business has been carried on by petitioners as a partnership under the same name, each owning the same proportionate interest therein. Since dissolution the volume of business has increased and in 1948 it was about twice as large as in 1943. This increase was *183 due partly to the improvement of general business conditions and also the acquisition by the firm after 1943 of the services of petitioners' three sons who had been trained in the business and whose services were valuable. Petitioners each filed individual income tax returns for the calendar year 1943. The book value of all tangible assets and accounts receivable of the company transferred to the partnership on October 31, 1943, was $9,276.68. The Commissioner determined that in addition to this, the company then had a good will value of $26,263, by applying a formula of capitalized earnings. He arrived at this sum by capitalizing, on a 15 per cent basis, the annual earnings (averaged over a five and one-third year period from July 1, 1938, through October 31, 1943) which were in excess of $757.73 per year, i.e., 8 per cent of $9,471.58 (invested capital averaged over the same period). The company, upon its dissolution, in addition to its tangible assets, had a good will value of $10,000. Opinion We cannot agree with the petitioners that the company had no good will value at the time of its dissolution. A corporation which had been a going concern continuously for more than *184 twenty years, which had weathered the years of the depression, and during a fifth of a century had with some degree of success been engaged in the same business, under the same name and at the same location, it would seem must have acquired some measure of that intangible asset which we call "good will." Neither can we sustain petitioners' contention that the success of the corporation was due solely to the skill, ability and other personal characteristics of petitioners themselves, and hence under the holding in D. K. MacDonald, 3 T.C. 720 and other cited cases, no value attributable to good will attached to the assets of the corporation. The facts here are distinguishable from those in that line of cases. While the petitioners here did contribute much to the success of the corporation, it cannot be said that they were solely responsible therefor, others also played a prominent and necessary part therein. If the company's success was due solely to petitioners' ability and personality, their continued connection and services with the business would have been indispensable to its existence. We do not think the separation of the petitioners from the company would have *185 meant its demise. It may not for awhile have done as well unless and until properly trained parties had taken over its management. That the company had a good will value is best evidenced by the fact that each time any of its stock was sold, after 1923, it brought a price in excess of the value of the company's physical or tangible assets. This difference in tangible values and the selling price of the stock we think evidences not only the existence of good will, but in some degree a measure of its value. While we differ with petitioners as to the existence of good will, we certainly differ with respondent's determination that its value was the sum of $26,263. His own witnesses condemn this figure as being excessive, and his attorneys do not defend it. In respondent's brief he says that the good will value was "not less than $15,000." One of the respondent's two witnesses concerning good will, both of whom qualified as experts upon this subject, testified that the good will value of the company upon its dissolution "was from $10,000 to $12,000," while the other witness gave two different figures, based upon two different computations, in one of which he determined the value to *186 be $12,410, and in the other $15,500. Under all the facts and circumstances, we think that the reasonable value of the good will of the company at the time of its dissolution was $10,000, which we have found, and so hold. Decisions will be entered under Rule 50. Footnotes
1. Petitioner Watkins purchased Crowe's 20 shares on July 1, 1923, for slightly more than $2,000, and in 1934, upon Deal's death, Watkins bought from Deal's estate his 20 shares for $4,500. Petitioner Biesterfeldt purchased Schiell's 20 shares in December, 1942, for $4,500. There appears to have been no other sales of the company's stock than these.↩